AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>13 54th Street,<br>Newburyport, Massachusetts | )<br>)<br>)<br>)<br>)<br>)    Case No.   14 - MJ - 2144 - MBB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A to the Affidavit of Task Force Agent Steven Hamel which is incorporated herein by reference.

located in the _____ District of _____ Massachusetts _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B to the Affidavit of Task Force Agent Steven Hamel which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

   ☑ evidence of a crime;

   ☑ contraband, fruits of crime, or other items illegally possessed;

   ☑ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846<br>18 U.S.C. § 1956 | Distribution and manufacturing of controlled substances, conspiracy, and money laundering. |

The application is based on these facts:

See attached affidavit of Task Force Agent Steven Hamel

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven Hamel, Task Force Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     04/01/2014

_____
*Judge's signature*

City and state:   Boston, Massachusetts

Marianne B. Bowler, United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A – 13 54th Street, Newburyport, MA**

The property at 13 54th Street in Newburyport, Massachusetts is described as single-story ranch-style home.   The house has gray siding with light-colored twin.   Viewed from the street, the entrance is on the right side of the building.   A photograph is set forth below.



## ATTACHMENT B

## ITEMS TO BE SEIZED

The items to be seized, listed as follows, constitute fruits, evidence, and instrumentalities of violations of conspiracy to distribute and manufacture, controlled substances, in violation of 21 U.S.C. § 846, conspiracy to launder money, in violation of 18 U.S.C. § 1956(h), money laundering, in violation of 18 U.S.C. § 1956, and other offenses including distributing and manufacturing controlled substances, in violation of 21 U.S.C. § 841(a)(1).

a.     Controlled substances, including synthetic cannabinoids, suspected synthetic cannabinoids, and analogues of controlled substances;

b.     Controlled substances paraphernalia and manufacturing materials, such as packaging materials, raw materials, chemicals, recipes, labels for packages, shipping labels, equipment, scales, and/or other instrumentalities of drug activity;

c.     Books, records, receipts, notes, ledgers, invoices, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, acquisition of materials used for manufacturing synthetic cannabinoids or other paraphernalia related to the manufacturing or distribution of controlled substances;

d.     Documents listing addresses, telephone numbers, email addresses of sources of supply, associates, and customers involved in the obtaining, packaging or distributing controlled substances and manufacturing of controlled substances.

e.      Records, receipts, notes, ledgers, invoices, records of real estate transactions, bank statements, bank records, passports, money drafts, money orders, bank drafts, wire transfers, cashier's checks, safe deposit box keys, post office box keys, and other items which demonstrate the obtaining, secreting, transfer, and/or concealment of drug proceeds and any assets derived from drug proceeds;

f.      Electronic equipment, such as telephones, cellular phones, pagers, and telephone answering machines, which contain any information regarding the manufacturing, transportation, ordering, purchasing, and/or distribution of controlled substances or the proceeds of such activities; United States currency in amounts of $1,000 or more; currency used during undercover purchases of controlled substances, financial instruments purchases with large amounts of currency such as money orders, traveler's checks, and cashier's checks; Indicia of occupancy, rental, and/or ownership of the Subject Premises, such as utility and telephone bills, cancelled envelopes, rental, purchase, or lease agreements, and keys.

g.      Photographs, negatives, video tapes, films, undeveloped film, and the contents therein, depicting controlled substances or any entities or individuals involved in the manufacturing, transportation, ordering, purchasing, and/or distribution of controlled substances;

h.      firearms; and

i       Any safe, lock box, or other container where the items listed in the above paragraphs could be hidden.

32

### AFFIDAVIT OF TASK FORCE OFFICER STEVEN HAMEL

I, Steven Hamel, being first duly sworn, depose and state:

### INTRODUCTION AND AGENT BACKGROUND

1.       I am a Task Force Officer ("TFO") with the Drug Enforcement Administration
("DEA").   In that role, I am a federal law enforcement officer under Fed. R. Crim. P. 41.  I have
been a law enforcement officer since 1982, when I became a member of the New Hampshire
State Police.  I am a 1982 graduate of the New Hampshire Police Standards and Training
Academy and the State Police Academy.  In the Summer of 1989, I became assigned as a Special
Agent ("S/A") with the Bureau of Intergovernmental Drug Enforcement (BIDE), now the Maine
Drug Enforcement Agency ("MDEA").  In 1990, I attended and successfully completed a two-
week Narcotic Investigator's School taught by the DEA and sponsored by the Maine Criminal
Justice Academy ("MCJA").  In 1992, I attended and successfully completed the week-long
Advance Drug Investigation School also sponsored by the DEA and MCJA.

2.       During the course of my law enforcement experience, I have acted in an
undercover capacity posing as a drug dealer.  During the course of my law enforcement
experience, I have assisted in the execution of search warrants, which authorized the search,
and/or seizure of scheduled drugs and scheduled drug related materials.  I have participated in
numerous investigations involving unlawful narcotics distribution, including several cases
involving large scale distribution networks.  Through my training and experience, I have become
familiar with the methods used by individuals engaged in narcotics trafficking.  Additionally, I
have authored several affidavits in support of search warrants and arrest warrants which have

resulted in the seizure of controlled dangerous substances and the arrests of narcotics distributors.

3.      I have been the affiant on affidavits in support of arrest warrants, search warrants. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I have personally participated in almost all aspects of drug trafficking investigations, both in leadership and subsidiary roles, and have personally observed various methods and operations relating to the manufacture, distribution, sale, possession, and consumption of various controlled drugs. I have debriefed numerous defendants, informants and witnesses with personal knowledge about drug trafficking activities and the operation of drug trafficking organizations. I have experience conducting surveillance, acting in undercover capacities, using confidential informants, and executing arrest and search warrants.

4.      As a result of my law enforcement experience, I have personal knowledge that drug traffickers use counter surveillance techniques to elude law enforcement. I know that drug traffickers frequently use false identification, cellular telephones, digital pagers, public pay telephones, calling cards, false business fronts and speak in coded and/or cryptic language when discussing drug trafficking activities with other drug traffickers and customers over the telephone. I know that when drug traffickers conduct their transactions, they frequently attempt to conceal evidence of their illicit activities in an effort to thwart law enforcement.  Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.

2

5.      I submit this affidavit in support of the issuance of a search warrant for a residence located at 13 54th Street in Newburyport, New Hampshire.   The property is further described in Attachment A.

6.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, including their direct examination of relevant documents, reports of interviews with witnesses in this investigation, and surveillance conducted in connection with persons and places mentioned in this affidavit.  I have not set forth every detail I or other law enforcement agents know about this investigation, but have simply set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested warrant.

## SYNTHETIC CANNABINOIDS

7.      Based on the investigation to date, I have learned that in recent years, individuals have begun to manufacture and traffic in smokable synthetic cannabinoid products, many times known on the street as "Spice" or "K2," which are the two past popular brand names for these products.  Synthetic cannabinoid products are a mixture of an organic "carrier" medium, such as the herb-like substance, which is then typically sprayed or mixed with a synthetic compound chemically similar to THC (tetrahydrocannabinol), the psychoactive ingredient in marijuana. Currently, there are hundreds of synthetic cannabinoid compounds.  Since 2011, the DEA has used its emergency scheduling authority under the Controlled Substances Act to list certain substances as controlled substances under Schedule I of the Controlled Substances Act.

3

8.      In response, clandestine manufacturers and traffickers began distributing

smokable synthetic cannabinoid products containing slightly varied synthetic cannabinoid

compounds in an attempt to circumvent newly enacted federal and state laws. Smokable

synthetic cannabinoid products are commonly purchased in head shops, tobacco shops, gas

stations, convenience stores, adult stores and over the Internet. They are often marketed as

incense or "fake weed" and almost always carry the markings "not for human consumption."

These markings are routinely in place in an attempt to circumvent the product being identified as

a controlled substance analogue of the newly controlled synthetic cannabinoids, as well as to

avoid being classified as a drug, and therefore subject to the federal Food and Drug

Administration ("FDA") testing and approval process. Users of these products have reported

effects similar to marijuana, but many times greater to include but not limited to paranoia, panic

attacks, increased heart rate and increased blood pressure. In some cases, use of these smokable

synthetic cannabinoids has led to serious psychotic hallucinations; some of which can last for

days. It also appears that these products may be stored in the body for long periods of time, and

therefore the long-term effects on the human body are not fully known. Manufacturers of this

product are not regulated and are often unknown since these products are purchased via the

internet whether wholesale or retail.

9.      On or about May 16, 2013, the DEA issued a final order to temporarily place

three synthetic cannabinoids on Schedule I of the Controlled Substance Act, pursuant to the

temporary scheduling provisions of 21 U.S.C. § 811(h). *See* 78 Fed. Reg. 28735-01 (May 16,

2013). This order placed these substances on Schedule I of the Controlled Substances Act for a

period of two years. One of the substances that was placed on Schedule I pursuant to this order

was [1-(5-fluoro-pentyl)-1H-indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone, its optical,

positional, and geometric isomers, salts and salts of isomers—7011 (Other names: 5-fluoro-UR-144, 5- F-UR-144, XLR11, 1-(5-fluoro-pentyl)-3-(2,2,3,3-tetramethylcyclopropoyl) indole) ("XLR11").  This substance is now listed in Schedule I.  *See* 21 C.F.R. 1308.11(h)(10).  Thus, XLR11 has been a Schedule I controlled substance since May 16, 2013.

10.     In addition to being a controlled substance under federal law.  Some states also have placed XLR11 on their lists of controlled substances.  For example, the state of Florida has listed XLR11 as a Schedule I controlled substance.  *See* Fla. Stat. Ann. § 893.03(1)(c)(152).  It is unlawful under Florida law to sell, manufacture, deliver or possess with intent to sell manufacture or deliver XLR11.  *See* Fla Stat. Ann. § 893.13(1)(a).  It is also unlawful to bring controlled substances into the state of Florida unless doing so is authorized by law.  *See* Fla. Stat. Ann. § 893.13(5).  Additionally, XLR11 became a controlled substance in New Hampshire on or about June 13, 2013.  *See* N.H. Rev. Stat. Ann. § 318-B:1-a.

11.     On February 10, 2014, the DEA issued a final order to temporarily place four additional synthetic cannabinoids on Schedule I of the Controlled Substance Act, pursuant to the temporary scheduling provisions of 21 U.S.C. § 811(h).  *See* 79 Fed. Reg. 7577 (February 10, 2014).  This order placed these substances on Schedule I of the Controlled Substances Act for a period of two years.  One of the substances that was placed on Schedule I pursuant to this order was N-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1H-indazole-3-carboxamide ("AB-FUBINACA").  This substance is now listed in Schedule I.  *See* 21 C.F.R. 1308.11(h)(10).  Thus, AB-FUBINACA has been a Schedule I controlled substance since February 10, 2014.  Additionally, AB-FUBINACA became a controlled substance in New Hampshire on or about March 12, 2014.  *See* N.H. Rev. Stat. Ann. § 318-B:1-a.

5

## PROBABLE CAUSE

12.     Beginning in approximately December of 2013, Special Agents and Task Force Officers in New Hampshire initiated an investigation of sales of synthetic cannabinoids at convenience stores in New Hampshire.   As a result of the investigation, KYLE HURLEY (hereinafter "HURLEY") and ROBERT COSTELLO (hereinafter "COSTELLO") were taken into custody on March 28, 2014. The have been charged by criminal complaint with conspiracy to distribute, and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Both HURLEY and COSTELLO are currently detained in federal custody in New Hampshire.

13.     On December 31, 2013, a law enforcement officer, operating in an undercover capacity ("UC1"), purchased a package of suspected synthetic cannabinoids bearing the label "Caution" at a store in Londonderry, New Hampshire.  Subsequent analysis by the New Hampshire Department of Safety's Forensic Laboratory showed that the package contained XLR11, a Schedule I controlled substance.

14.     On January 10, 2014, another law enforcement officer acting in an undercover capacity ("UC2") met with the owner of a convenience store in Londonderry, New Hampshire and purchased approximately 50 bags of synthetic cannabinoids.   During the meeting, UC2 purchased 45 bags labelled "Toxic Blue Magic" and five bags labelled "Bizarro" in exchange for $600.00 in cash.   As with all cash transactions discussed in this affidavit, law enforcement has maintained a list of the serial numbers of all bills used in the transaction.  Subsequent analysis was performed on several bags of each product by the New Hampshire Department of Safety's

6

Forensic Laboratory.  Each package that was analyzed contained XLR11, a Schedule I controlled substance.

15.      On January 21, 2014, UC2 made arrangements to purchase an additional 50 bags of synthetic cannabinoids at the same convenience store in Londonderry.   UC2 purchased 24 packages labelled "Toxic Blue Magic," 25 packages labelled "Bizarro," one package labelled "KMA," one package labelled "Platinum Caution," and one package labelled "Smoking Santa" in exchange for $600.00 in cash.  Subsequent analysis was performed by the New Hampshire Department of Safety's Forensic Laboratory on the contents of some of the packages.  The analysis showed that packages labelled "Toxic Blue Magic," "Bizarro," "KMA," and "Platinum Caution," each contained XLR11, a Schedule I controlled substance.  The package of "Smoking Santa" did not contain a controlled substance.

16.      On February 27, 2014, UC2, along with other undercover law enforcement officers ("UCs"), met with the owner of the convenience store in Londonderry.   During the conversation, which was recorded, the UCs expressed an interest in obtaining a large quantity of synthetic cannabinoids to sell in Florida.  During the meeting, the owner advised that he obtained his synthetic cannabinoids from a distributor who also provides him with other products.  During the meeting, the owner called his distributor (subsequently identified as COSTELLO).  The UCs explained to COSTELLO that they were interested in purchasing large quantities of synthetic cannabinoids in order to sell them in Florida.  COSTELLO advised that the products were illegal in Florida but indicated that he was willing to ship the products to Florida.  COSTELLO advised that he shipped the products to multiple different states.

7

17.     On March 4, 2014, two UCs, who were equipped with a body-wire, met with the owner of the convenience store in Londonderry where they discussed arranging a transaction with COSTELLO. The owner contacted COSTELLO and indicated that the UCs were interested in purchasing a quantity of "Toxic Blue Magic" and "Platinum." COSTELLO agreed to travel from Lawrence, Massachusetts to Londonderry in order to conduct the transaction.

18.     Later on March 4, 2014, the UCs, who were equipped with a body-wire, met with COSTELLO and the owner of the store in Londonderry. During the meeting the UCs again explained that they planned to purchase large quantities of synthetic cannabinoids that would then be sold in Florida. COSTELLO advised the UCs that a 10 gram package of "Bizarro" could sell for up to $100.00 in the South. COSTELLO advised that the UCs could get whatever price they wanted for the product because an individual who used the product would pass any drug test, including a hair test. One of the UCs told COSTELLO that the UC appreciated that COSTELLO had advised the UCs that the products were illegal in Florida.

19.     Later in the conversation, the UCs discussed smoking the synthetic cannabinoids. COSTELLO said "My stuff is stronger than anyone's out there." Later, he advised the UCs that they need to tell customers that the products were "800 times" stronger than any marijuana out on the market. COSTELLO explained that there are two synthetics in his product. He said that he obtained the synthetics in bulk and packages it himself. COSTELLO later stated that the products are illegal in some states and other communities (including Florida) but that the federal government cannot ban the products on the spot. He indicated that it takes the federal government two to three months to ban a product, which provides sufficient time to change the ingredients. Because the UCs were planning to sell the product in Florida, COSTELLO advised

8

the UCs not to put the product on display.  He further advised the UCs to have other individuals

sell the products for them in Florida so that the UCs would not be linked to the synthetic

cannabinoids in the event that the sellers got caught.  COSTELLO further advised the UCs that

they will make a lot of money.

20.     The UCs advised COSTELLO that they would purchase synthetic cannabinoids

from him directly in the future.  During the conversation, COSTELLO stated that he sold about

150 kilograms of synthetic cannabinoids per month.  Subsequently, the owner of the store told

the UCs that he trusted COSTELLO and would not buy from anyone else.  He further confirmed

that all of the synthetic cannabinoids that he previously had sold to the UCs had been provided

by COSTELLO.

21.     During the conversation, the UCs indicated that they wanted to purchase 200

packages of synthetic cannabinoids and that the synthetic cannabinoids would be taken to Florida

to be sold.  COSTELLO later advised the UCs to go to Facebook under "Bob Costello" and see

the page for "Bobs420shop."  Based upon my training and experience, I know that "420" has

developed into a slang reference to marijuana.  COSTELLO advised that he had five baggers and

one sealer and that he moved his operation frequently.  He stated that his operation currently was

in the city of Lawrence, Massachusetts.

22.     UC2 then went with COSTELLO to COSTELLO's vehicle, gray 2007 Jeep Grand

Cherokee, which was parked outside Global Gas.  At COSTELLO's direction, UC2 retrieved a

black trash bag containing 100 packages of "Toxic Blue Magic" and 100 packages of "Caution

Platinum."  COSTELLO also removed other items from the vehicle, which he provided to the

UCs, including packages of suspected synthetic cannabinoids labelled "Mad Hatter

(Strawberry)", "Mad Hatter (Kush)," "Scooby Snax (kush)," "K.O. Knockout," "Bizarro,"
"Deadman Walking," "Mr. Nice Guy (shamrocks)," "California Dreams," "WTF," "O.M.G.,"
"Time Out," "Scooby Snax (blueberry)", "Madd Hatter," and "Kush (Grape)."   COSTELLO
also provided the UCs with several vapor pens and glass smoking pipes. COSTELLO later
showed the UCs how to use the vapor pens and confirmed that they could be used for smoking
synthetic cannabinoids.

23.     The UCs asked COSTELLO about the price of the synthetic cannabinoids and
COSTELLO asked the store owner what he was charging. The store owner stated that he
charged $9.00 per package. COSTELLO told the UCs that if the UCs conduct additional
business with him, the price will go down. COSTELLO further advised the UCs that the
products would sell well in Florida because the products are difficult to obtain there. He
explained that this is why customers find him on Facebook. Shortly after UC2 provided
COSTELLO with $1,800.00 to pay for the synthetic cannabinoids, COSTELLO advised UC2
that he would save UC2's telephone number under "F" for Florida.

24.     Subsequent analysis was performed on several bags of "Toxic Blue Magic" and
"Caution Platinum" products by the New Hampshire Department of Safety's Forensic
Laboratory. Each package that was analyzed contained AB-FUBINACA, a Schedule I
controlled substance.

25.     On or about March 10, 2014, and March 11, 2014, acting in an undercover
capacity, UC2 spoke in recorded telephone calls with COSTELLO and indicated that the UCs
would like to purchase an additional 200 packages of synthetic cannabinoids. On March 11,

2014, the UCs made arrangements to travel to COSTELLO's residence at 19 Hoffman Avenue in Lawrence, Massachusetts.

26.     On March 11, 2014, another two UCs, equipped with a body-wire, met with COSTELLO at 19 Hoffman Avenue.  During their conversation, the UCs inquired about the possibility of having synthetic cannabinoids shipped to Florida.  COSTELLO explained that he buys, weighs, packs, and ships synthetic cannabinoids.  Later in the conversation, COSTELLO indicated that he sends his products via the United States mails.  When the UCs inquired about how payment could be sent to him, COSTELLO indicated that they could send him cash in an envelope or send the money via Western Union, money order or Moneygram.  COSTELLO indicated that they could send a money order to him in his name and list any name they want as the sender.

27.     During their conversation, COSTELLO offered to show the UCs his packaging operation, which was located in a shed on the property.  Inside the shed, three individuals were observed placing leafy substances into small packages.  Inside the residence, the UCs also observed thousands of empty packages similar to the ones that they had purchased in the past.  The packages contained a wide variety of product names and logos.  COSTELLO stated that he had to pay Customs in order to obtain products from China.

28.     COSTELLO further stated that he obtains his product from another individual and that he bags product for the other individual.  Later in the conversation, COSTELLO indicated that he worked with an individual who had a barn in Epping, New Hampshire.  The individual in

11

Epping mixes the synthetic cannabinoids in cement mixers in the barn and then spreads multiple kilograms of the product on plastic sheets. The product then is sprayed with synthetics.[1]

29.     During the meeting, COSTELLO provided the UCs with 200 packages of suspected synthetic cannabinoids in exchange for $1,600.00.   Prior to providing the packages to the UCs, COSTELLO had stored the packages in the front seat of his Jeep. The packages were labelled "Caution Platinum." He also provided the UCs with samples of an additional synthetic cannabinoid and several bottles of a liquid "incense" that I believe is a liquid synthetic cannabinoid product.

30.     Subsequent analysis was performed on several bags of the "Caution Platinum" product by the New Hampshire Department of Safety's Forensic Laboratory. Each package that was analyzed contained AB-FUBINACA, a Schedule I controlled substance.   Four bottles of the liquid products were found to contain AB-FUBINACA.  Three bottles were found to contain XLR11. As discussed, above, both of these are Schedule I controlled substances.

31.     On or about March 14, 2014, acting in an undercover capacity, UC2 engaged in a recorded telephone conversation with COSTELLO.  During the conversation, COSTELLO agreed to ship approximately 300 packages of synthetic cannabinoids to Florida.  COSTELLO indicated that he would ship the packages to an address in Florida. COSTELLO agreed that UC2 could pay him for the product when they met in a few days. Later that day, COSTELLO sent UC2 a text message that contained the FEDEX tracking number for the package.

---

[1] COSTELLO has described the manufacturing operation on several occasions, but his descriptions of the process are not always precisely the same.

12

32.     On or about March 14, 2014, law enforcement officers determined that the FEDEX package was located at a FEDEX facility in Manchester, New Hampshire. The package was addressed to UC2's undercover name. UC2 opened the package and found 200 packages of "Caution Platinum" and 100 packages of "Caution Gold." Most of the packages were removed from the box and sent to the New Hampshire Department of Safety's Forensic Laboratory for analysis. That analysis is pending. The box was resealed and sent on to Florida so that it would appear that the products were delivered in Florida.

33.     On or about March 16, 2014, acting in an undercover capacity, UC2 engaged in a recorded conversation with COSTELLO in which UC2 advised him that UC2 would be returning from Florida soon and asked if he could meet the UCs in New Hampshire on March 17, 2014. COSTELLO agreed to meet with the UCs on the following day.

34.     On or about March 17, 2014, COSTELLO met several UCs at a restaurant in Hampton, New Hampshire. During the meeting, which was recorded, UC2 paid COSTELLO $2,580.00 for the 300 packages that he had shipped a few days earlier.

35.     During the meeting, COSTELLO stated that he shipped synthetic cannabinoids all over the United States. He stated that he had one customer in Pennsylvania who bought $7,000.00 worth of products each month. COSTELLO stated that customers know what's in the product and discussed the effect that it had on users' systems. COSTELLO explained that he could provide the UCs with large quantities of synthetic cannabinoids and stated that he and his associates were making their own custom blend. He also discussed applying flavoring to the synthetics cannabinoids to make it more attractive to customers.

36. COSTELLO explained that the hardest part of the manufacturing process was obtaining chemicals. He stated that they sprayed two chemicals on the synthetic cannabinoids. COSTELLO stated that they previously had gotten the chemicals from California, but now were obtaining the chemicals from another state. COSTELLO explained that the product was made by obtaining leaves, such as marshmallow leaves, and placed them in cement mixers. He stated that two chemicals were sprayed on the leaves and that acetone was applied to dry the product out. He stated that 25 to 50 kilograms was manufactured at a time. He explained that he and his associates were making a product that was more potent than any other similar products on the market. COSTELLO explained that another individual manufactured the products on the back of a property in New Hampshire and noted that they had to be discreet. COSTELLO stated that after the product was made, he would take it in his Jeep to his residence, where he would spray various flavors on the product prior to bagging it.

37. COSTELLO explained that he could provide the UCs with whatever they need and discussed providing tens of thousands of bags of synthetic cannabinoids to the UCs. He stated that he could make the product as strong as the UCs wanted, but cautioned that they should not make it too strong because then users would get sick and may not keep using the product. COSTELLO stated that he has "millions" of bags in his residence and that he sometimes has employees bagging synthetic cannabinoids for him 24 hours per day.

38. COSTELLO stated that he worked with another individual who operated multiple manufacturing locations in New Hampshire, including locations in Manchester and Nashua. He stated that this individual used multiple telephones. He stated that the other individual invented synthetics and that he used to sell synthetic cannabinoids in Florida. The UCs explained that

14

they ordinarily trafficked in marijuana but indicated that they might be interested in distributing large quantities of synthetic cannabinoids. COSTELLO stated that he would call his associate and attempt to make arrangements for him to participate in a future transaction with the UCs.

39.     Later on March 17, 2014, UC2 engaged in a recorded undercover conversation with COSTELLO in which he indicated that he had spoken with his associate and stated that the individual would be contacting UC2. Shortly thereafter, UC2 received an incoming call from an individual who was subsequently identified as HURLEY. HURLEY then engaged in a recorded conversation with another UC ("UC3"). UC3 explained that he usually dealt with "real from up north," which UC3 used to refer to Canadian marijuana. HURLEY explained that the product was legal in some states and not legal in others. UC3 stated it did not matter to UC3 whether the product was legal. HURLEY asked whether the marijuana that UC3 obtained in Canada was grown in fields or greenhouses and indicated that he was interested in providing solar panels for the greenhouses. UC3 expressed an interest in purchasing large quantities of synthetic cannabinoids. HURLEY stated that he could ship the product by mail and asked if the UCs wanted bulk product and would be bagging it themselves. HURLEY indicated that he could provide bags containing 15,000 grams of product. HURLEY discussed the high quality of the product and indicated that he had at least 100 kilograms available. He also discussed that if the UCs obtained an appropriate location, he could train them in the manufacturing process. HURLEY expressed concern about meeting new people and asked the UCs how they knew COSTELLO.

40.     Later that day, UC2 engaged in a recorded conversation with COSTELLO in which UC2 discussed the possibility of meeting with HURLEY on March 18, 2014, to discuss

15

future transactions. COSTELLO stated that HURLEY was concerned because he was a candidate for "three strikes and you're out" and that HURLEY wanted COSTELLO to make sure that the UCs were not law enforcement officers.

41.     I have reviewed criminal records related to HURLEY. HURLEY has a number of prior convictions, including convictions for drug possession, falsifying physical evidence, and resisting arrest.

42.     On March 18, 2014, several UCs met with HURLEY and COSTELLO at a location in Kittery, Maine. The meeting was audio and video recorded. During the meeting, HURLEY stated that he could not go to Florida for a few more years. He further advised the UCs that they would deal with COSTELLO until he felt comfortable with them.

43.     HURLEY then explained that his product is "high end" and all fresh and "perfect." He joked that customers think that the bags bearing different labels actually contained different products, when he actually placed the same product in packages that simply bore different labels. He stated that a customer might complain that he did not get high on a particular product when the products were all the same.

44.     HURLEY explained that doing business with the UCs was "perfect timing" because he might be interested in phasing himself out of the business for "safety purposes." He noted that too many people knew what he was doing and emphasized that it was important to deal with individuals who can be trusted. He stated that he could provide approximately 33 bags of synthetic cannabinoids, each of which contained 15,000 grams. He indicated that if business with the UCs went well, they could discuss a profit sharing arrangement.

16

45.     HURLEY stated that he claims that he does not know that the product is for human consumption. He stated that this statement "covers you" on liability and warned the UCs not to insinuate to customers that the product is for smoking.

46.     The UCs then discussed a deal to obtain $5,000 to $10,000 worth of synthetic cannabinoids. HURLEY told the UCs that they would deal with COSTELLO. He discussed that the product was strong but emphasized that the product cannot be too strong or users will get sick. He told the UCs that the quality was always there. He noted that he had difficulty justifying the large quantities of acetone that he purchased, noting that he was running out of jobs to attach it to. They later agreed on a transaction in which the UCs would pay $7500.00 for a large bag of synthetic cannabinoids. HURLEY explained that COSTELLO would go and obtain the product, but that if there was a problem, the UCs could call HURLEY. HURLEY advised the UCs to call on a "clean line" and stated that "I'll solve the problem."

47.     HURLEY had several cellular telephones in his possession. He showed one phone to UC3 and told UC3 to take down the telephone number. HURLEY explained that he sold three grades of products, "high high," "high," and "medium." He stated that it was all good and would all sell. Prior to leaving, HURLEY asked the UCs to show him the money for the deal out of "respect."

48.     After the meeting, surveillance officers observed COSTELLO and HURLEY travel in COSTELLO's Jeep to a business location in Seabrook, New Hampshire. HURLEY exited the vehicle. Another male got into COSTELLO's Jeep and it was observed going to 3A Whittier Drive in Seabrook. After staying at the location for a brief period of time, the vehicle returned to the business location, where the male exited COSTELLO's vehicle.

17

49.     COSTELLO's Jeep later was observed traveling to 82 Jacobs Well Road in Epping, New Hampshire.  Surveillance officers briefly lost sight of COSTELLO and then observed him again at the Jacobs Well location.  Two large shipping containers were observed on the property.  COSTELLO later departed the location and was observed traveling south on Route 125.  UC2 engaged in a recorded conversation with COSTELLO in which he stated that he had picked up the product in Epping and that he was en route to his residence to obtain bags for the product.  He later was observed at his residence at 19 Hoffman Avenue in Lawrence, Massachusetts.  COSTELLO subsequently agreed to bring the synthetic cannabinoids to the UCs in Maine.

50.     Based upon COSTELLO's prior statements, as well as the surveillance observations on March 18, 2014, I believe that COSTELLO retrieved a quantity of synthetic cannabinoids that had been stored at 82 Jacobs Well Road.  There is a large garage/barn structure attached to the residence.  Because COSTELLO previously had stated that the synthetic cannabinoids were being manufactured at a barn in Epping, I believe that 82 Jacobs Well Road may be the location where HURLEY and his associates manufacture synthetic cannabinoids.

51.     Later on March 18, 2014, COSTELLO returned to Maine and met with the UCs. During the meeting, which was audio and video recorded, COSTELLO provided the UC with a bag contained suspected synthetic cannabinoids.  COSTELLO stated that the bag contained over 15,000 grams.  The UCs provided COSTELLO with $7,500.00.

52.     During the meeting, COSTELLO apologized for the delay and explained that he had travelled to Epping, New Hampshire to obtain the synthetic cannabinoids, but that the trailer where they were stored was locked.  He stated that he obtained bolt cutters and cut the lock off

18

the trailer so he could obtain the synthetic cannabinoids. He explained that one of HURLEY's workers was unreliable because he is "on powder." COSTELLO told the UCs that they would only deal with HURLEY or COSTELLO.

53.     COSTELLO and the UCs discussed the process of bagging the synthetic cannabinoids. He explained that the baggers can get high while packaging the product. He told the UCs that one person lasted 15 minutes working as a bagger and then slept for two hours.

54.     COSTELLO provided the UCs with a spray bottle that was used for flavoring. The UCs asked if the spray bottle contained the illegal stuff and COSTELLO explained that the "illegal stuff" was already mixed in. COSTELLO then gestured toward a small sample of the synthetic cannabinoid that he had retrieved from the large bag. He also discussed the quality of the product and told the UCs that they would see the difference when they smoked it. He stated that he had 60 to 70 pounds of synthetic cannabinoids all ready.

55.     COSTELLO again mentioned HURLEY's concern about the UCs and stated that he told HURLEY "If these guys are detectives, the government is doing something right." He then told the UCs what prices they should charge for the products. He also noted that some people think that one product tastes better than another when it is all the same product.

56.     COSTELLO told the UCs that HURLEY used more chemicals on his products than other manufacturers. He claimed that HURLEY knows the laws and stated that if a product was banned in July, "we would make a new one in June."

57.     COSTELLO stated that he and HURLEY worked out of multiple locations, including Nashua, Manchester, and Epping. He stated that HURLEY wanted to concentrate on

19

doing business with the UCs and that he would give the UCs the recipe for making the synthetic cannabinoids.

58.     Later that day, a UC3 spoke to HURLEY in a recorded call. During the conversation, he asked if the UCs were happy. UC3 stated that UC3 was happy with the product. HURLEY stated that he had some other interesting things to discuss with UC3 in the future.

59.     Subsequent analysis was performed on the substance provided by COSTELLO to the UCs on March 18, 2014, by the New Hampshire Department of Safety's Forensic Laboratory. The package was analyzed contained AB-FUBINACA, a Schedule I controlled substance.

60.     In a series of calls on March 26, 2014, the UCs had further discussions with COSTELLO and HURLEY in which they discussed an additional deal for approximately 70 15,000 gram bags of synthetic cannabinoids. In a recorded telephone call on March 26, 2014, HURLEY advised UC3 that he had access to four times the quantity that UC3 was seeking. HURLEY told UC3 that they did not need each other, but that he wanted to do business with UC3. He further stated that it would be "safer" if they made decisions together. HURLEY discussed that he did runs to Florida by train in the past and was concerned about avoiding dogs. When they discussed the potential price and quantity for the transaction, HURLEY indicated that he had to take COSTELLO's commission into account. HURLEY stated that he was leaving on March 31, 2014, for Jamaica.

61.     In another call, UC3 and HURLEY spoke about the deal. HURLEY indicated that he was with COSTELLO. HURLEY advised UC3 that the 70 bag deal would be wiping HURLEY out. He stated that his inventory is exactly the amount that the UCs had ordered. HURLEY indicated that he gets back from Jamaica on April 8, 2014. They made plans for a deal on March 28, 2014. HURLEY indicated that he would be sending one or two workers to assist in the deal. They also discussed having a money counter available for the transaction.

62.     On March 28, 2014, HURLEY and COSTELLO met with UCs at a location in Portsmouth, New Hampshire. HURLEY and COSTELLO provided the UCs with approximately 35 bags, each of which contained approximately 15 kilograms of suspected synthetic cannabinoids. They then left the location and indicated that they would be returning with an additional quantity of synthetic cannabinoids.

63.     Later on the same day, COSTELLO delivered approximately 39 additional bags to the UCs. Each of these bags also weighed approximately 15 kilograms. COSTELLO subsequently was taken into custody. HURLEY met with the UCs at a separate location and was taken into custody as he took delivery of what he believed to be $250,000 in cash. A search of HURLEY's person yielded four cellular telephones and a Florida driver's license.

64.     Prior to his arrest, HURLEY told UC3 that his father was waiting nearby to pick up the money that would be paid by the UCs for the transaction. HURLEY stated he and his father had been in business for a long time and that his father was involved in his business of selling synthetic cannabinoids. During the meeting, he placed a telephone call to his father and advised him that the transaction was going well. UC3 also overheard HURLEY discussing the possibility of picking up money during the conversation with his father. HURLEY also

21

discussed with UC3 the possibility of using his father as a signatory on a safe deposit box that might be used for future transactions. HURLEY stated that it would be better to use his father's name because HURLEY is a convicted felon. HURLEY stated that his father would access the box to obtain payments for future transactions.

65.    COSTELLO was arrested on March 28, 2014. After being advised of his *Miranda* rights, he stated that recently (possibly Tuesday March 25, 2014), he traveled to Epping, New Hampshire and obtained between 30 and 35 bags of synthetic cannabinoids, which he brought to Whittier Drive in Seabrook, New Hampshire. He left a trailer containing the synthetic cannabinoid on the property of 3A Whittier Drive. That trailer subsequently was used to deliver synthetic cannabinoids to the UCs.

66.    The property at 3A Whittier Drive shares a driveway with 3 Whittier Drive and 3B Whittier Drive. Looking at the property from Whittier Drive, 3A is a gray residence located on the left. The properties of 3 and 3B Whittier Drive are green and located on the right. 3B has two garage doors that face into the driveway. However, there is an additional larger garage that is attached to the side of the building. There is a side entrance to the larger garage.

67.    COSTELLO stated that on March 28, 2014, he went to the Whittier Drive location after making the first delivery to the UCs. At Whittier Drive, he met with Evan Hurley, KYLE HURLEY's brother. Evan Hurley retrieved seven bags of synthetic cannabinoids from the garage located at the rear of a green building. COSTELLO stated that Evan Hurley gained access to the garage through the side entrance. COSTELLO stated that Evan Hurley loaded the bags of synthetic cannabinoids into a trailer, which COSTELLO then transported for delivery to

22

the UCs.  COSTELLO also stated that he had previously delivered money to KYLE HURLEY and another individual at the Whittier Drive.

68.     Public records show that George Hurley, who is believed to be HURLEY's father, resides at 3A Whittier Drive.  On or about March 28, 2014, law enforcement officers attempted to interview the residents of 3A Whittier Drive, including George Hurley.  The residents declined to speak with law enforcement and refused to consent to a search.  The premises were secured pending a request for a search warrant.  However, George Hurley acknowledged that he was the owner of the property at 3, 3A, and 3B Whittier Drive.

69.     A search warrant was executed at a garage located at 3B Whittier Drive during the evening of March 28, 2014.  The search yielded approximately 18 bags each of which contained approximately 15 kilograms of suspected synthetic cannabinoids.  The search also yielded empty boxes of acetone and glassware that is associated with the smoking of marijuana and synthetic cannabinoids.

70.     On March 28, 2014, after HURLEY was taken into custody, his vehicle (a black BMW registered in the name of his father) was searched.  That search yielded approximately three cellular telephones, suspected drug ledgers, and a *Time* magazine.  The *Time* magazine was addressed to Kellan Maloney at 13 54th Street, Newbury, Massachusetts.

71.     As part of COSTELLO's post-arrest statement, he indicated that he had previously made cash payments to HURLEY at a location on Plum Island in Massachusetts. While he did not know the address, he stated that he would recognize the residence if he saw it. COSTELLO agreed to be transported to Massachusetts to attempt to identify the location.  He

23

subsequently identified 13 54th Street in Newbury, Massachusetts as the residence where he

previously had delivered cash to HURLEY. He stated the payments were money that

COSTELLO owed HURLEY for synthetic cannabinoid transactions. He stated that a few days

after he accepted the payment for the March 18, 2014, 15-kilogram transaction from the UCs, he

traveled to 13 54th Street in Newbury where he provided the money to HURLEY. He further

stated that HURLEY resided at that address with his girlfriend.

72.     That same evening, I spoke to a neighbor who stated that Maloney resided at the

13 54th Street location with her boyfriend, whom the neighbor identified as "Kyle." The

neighbor stated that "Kyle" operated a black, BMW and that his girlfriend operated silver Jaguar.

The neighbor also provided a telephone number for Maloney, (603) 918-6983. An internet

search has identified a website listing this number as a contact number for "Kellan Maloney" at a

business. Public records show that Maloney is the registered owner of a silver Jaguar. The

vehicle is registered in her name in Massachusetts at 13 54th Avenue in Newbury,

Massachusetts. The neighbor further advised that the property was owned by a very old woman

who resided in Florida and that Maloney and HURLEY rented the property

73.     Property records show that the residence at 13 54th Street, Newbury,

Massachusetts is owned by an individual who law enforcement believes resides in Florida.

Public records show that the registered owner of the property is an 80-year old woman who

resides in Landolakes, Florida.

74.     I have had conversations with law enforcement officers in Newbury and

Newburyport. Although the property is listed as being in Newbury, Massachusetts, Newburyport

Police initially advised that they would ordinarily be responsible for responding to any calls for

that location. I have subsequently learned that odd-numbered street addresses are considered to be Newbury.

75.     During the evening of March 28, 2014, law enforcement officers went to the location and knocked on the door. The door was not locked and was slightly ajar. A piece of weather stripping appeared to be out of place on the side of the door. A Newburyport police officer was present and briefly entered the unoccupied residence because he was concerned that a burglary might have taken place. The premises were not searched but a cursory view of the premises showed that several kitchen cabinets were open and some suspected synthetic cannabinoid packages also were observed.

76.     At a detention hearing in federal court on March 31, 2014, HURLEY (through counsel) represented that he lived with his parents at 3A Whittier Drive in Seabrook, New Hampshire. HURLEY did not provide any information suggesting that he resided at 13 54th Street in Newbury, Massachusetts or any information about his relationship with Maloney.

77.     Based upon my experience, and knowledge from others involved in narcotic investigations, I know the following:

> a.  That drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, rented storage units, or other places under their immediate control;
>
> b.  That drug traffickers frequently maintain on hand large amounts of U.S. Currency in order to maintain and finance their ongoing drug business and often keep the currency in their residences;

25

c.  That drug traffickers maintain books, records, receipts, notes, ledgers, airline

tickets, money orders, and other papers relating to the transportation, ordering,

sale, and distribution of controlled substances or paraphernalia.  That drug

traffickers commonly "front" drugs (provide drugs on consignment) to their

clients.  That the aforementioned books, records, receipts, notes, ledgers, etc.

are maintained where the drug traffickers have ready access to them and may

be in electronic form;

d.  That drug traffickers commonly maintain addresses or telephone numbers in

books, papers or electronic records which reflect names, addresses, and/or

telephone numbers for their associates in the trafficking organization;

e.  That drug traffickers take or cause to be taken photographs of them, their

associates, their property and their product and that these traffickers usually

maintain these photographs in their possession;

f.  That drug traffickers usually keep near at hand paraphernalia for packaging,

cutting, weighing, using, and distributing drugs.  This paraphernalia includes

but is not limited to scales, plastic bags, cutting agents, straws, razor blades,

pagers, cellular phones, and other equipment commonly used in the

distribution, manufacture, or use of controlled substances;

g.  That drug traffickers involved in manufacturing or producing synthetic

cannabinoids usually maintain evidence related to their activities, including,

but not limited to, raw materials, chemicals, flavorings, bags, and heat sealers.

26

h.   That drug traffickers sometimes purchase and/or title their assets in fictitious names, aliases, or the names of relatives or associates to avoid detection of these assets by government agencies.  Even though these assets may be in names other than the drug trafficker, the trafficker actually owns and continues to use these assets and exercise dominion and control over them;

i.   That drug traffickers sometimes utilize electronic equipment such as computers, personal data assistants (PDA), tablet computers, cell phones, caller ID machines, telephone answering machines, and GPS devices to generate, transfer, count, record and/or store drug related information; That when drug traffickers amass proceeds from the sale of drugs, the drug trafficker may attempt to legitimize these profits through money laundering activities.  To accomplish these goals drug traffickers utilize, domestic and international banks, securities brokers, professionals such as attorneys and accountants, casinos and real estate.  Drug traffickers who engage in money laundering will regularly maintain a record either in electronic or written form, of these financial transactions;

j.   That drug dealers often possess weapons such as handguns or other firearms. These weapons are recognized to be "tools of the trade," used to protect persons involved in illegal drug activity and to protect their inventory, supplies, or cash on hand;

27

k.  The items set out in Attachment B are commonly possessed by drug traffickers in their homes, automobiles, rented storage units, or other places under their control;

l.  That drug traffickers commonly conduct counter-surveillance, and check for law enforcement personnel at known drug trafficking locations. That law enforcement operations have to be sometimes carried out covertly, under the cover of darkness, or at different times of the day in order to avoid counter surveillance techniques and violence upon law enforcement agencies;

m.  Based upon my training and experience, your affiant believes the items set forth on Attachment B are evidence of violations of the offenses being committed by HURLEY, COSTELLO and others, including conspiracy to distribute and possess with intent to distribute controlled substances, distribution of controlled substance, and money laundering offenses.

78.  Based on the foregoing information, your affiant believes probable cause exists that there is now, at the residence located at 13 54th Street in Newbury, Massachusetts, items as set forth in Attachment B which constitute evidence of the commission of criminal offenses involving the distribution of controlled substances, manufacturing controlled substances, conspiracy and money laundering offenses as set forth in 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 1956.

79.     I declare under the penalty of perjury that the above-foregoing facts and

circumstances are true and correct to the best of my knowledge and belief.

Steven Hamel
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on April 1, 2014.

Marianne B. Bowler
United States Magistrate Judge